[Civil No. 3919.   Filed March 7, 1938.]

[76 Pac. (2d) 1163.]

ANTONIO MELENDEZ, Petitioner, v. GARWOOD
JOHNS and WAYNE BRAND, Defendant Employers, and THE INDUSTRIAL COMMISSION
OF ARIZONA, Respondents.

Miss S. V. Ross, for Petitioner.

Mr. Herman Lewkowitz and Mr. Raymond R. Wein, for Respondents Garwood Johns and Wayne Brand.

ROSS, J.—This proceeding is one under the Workmen's Compensation Law. Rev. Code 1928, sec. 1391 et seq., as amended. The Industrial Commission denied Melendez compensation and dismissed his application therefor on the ground that the work he was doing when injured was not covered by the Compensation Law. The employers were Garwood Johns and Wayne Brand, according to the commission's findings. The commission is made a party as the representative of the State Compensation Fund.

On or about May 1, 1936, and after the spring lettuce season in the Salt River Valley was practically over, the employers, Johns and Brand, agreed to and did buy a lettuce field located a short distance south of Glendale for the purpose of harvesting and shipping it to the markets. This was the only transaction of the kind in which Johns and Brand had ever engaged together. Johns' business, according to his testimony, was the buying, shipping, and growing of lettuce. Brand's business was the buying in the field, harvesting, and shipping of produce, including lettuce. Whether he was a grower does not appear.

Johns and Brand employed L. F. McKillip to harvest this field of lettuce for the stipulated price of 16 cents a packed out crate at the packing sheds. McKillip employed Melendez to assist in harvesting, and said he was to do anything he told him to do. There was considerable discussion at the hearing as to just what his duties were, and it was stipulated by counsel that his job was "picking lettuce." It was the duty of the pickers to follow the cutters and pick up from the ground the lettuce and put it into field crates. The work of the cutter was to cut the lettuce with a lettuce knife, and then there were the packers who packed the lettuce into the crates at the shed. While riding on a truck on the 2d of May from the field to Phoenix, Melendez suffered an injury to his hand in a collision with another automobile. At the time he was on his way to the packing shed to be paid for his day's work. The truck in which he was riding was under the control of McKillip.

There were about twenty cutters, pickers, and packers engaged in harvesting this field of lettuce.

The Industrial Commission under these facts found that Melendez was an agricultural worker not employed in the use of machinery, and denied his application for compensation, the employers not having elected to bring agricultural workers not engaged in the use of machinery under the Workmen's Compensation Law, and "ordered that said proceedings be dismissed by reason of lack of jurisdiction." A motion for a rehearing was made in due course and denied, and we are asked to review the proceeding.

The petitioner's claims, we think, may be stated to be (1) that Melendez and his coworkers were not agricultural workers. His counsel in her brief says:

"Certainly no one after reading all the evidence in this case could question that Johns and Brand had in service three or more workmen or operatives regularly

employed in the same business, except agricultural workers.''

(2) That the Workmen's Compensation Law as revised in the Code of 1928, sections 1418 and 1419, makes employers of agricultural workers subject to the Compensation Law, even though ''not employed in the use of machinery.'' We will consider these points in the reverse order.

The Workmen's Compensation Law was passed in 1925, chapter 83. The relevant portions of the sections involved, and as originally passed, read as follows:

''Section 44. Employers Subject to This Act.—The following shall constitute employers subject to the provisions of this act:

''(1) The state, and each county, city, town, municipal corporation, and school district therein.

''(2) Every person, firm and private corporation, including every public utility, that has in service three or more workmen or operatives regularly employed in the same business, or in or about the same establishment, under any contract of hire, express or implied, oral or written, except agricultural workers not employed in the use of machinery, and domestic servants; provided, that employers who have in service agricultural workers as designated and domestic servants shall have the right to come under the terms of this act by complying with the provisions thereof and all rules and regulations of the commission.

''The term 'regularly' as herein used, shall include all employments, whether continuous throughout the year or for only a portion of the year. It means all employments in the usual course of the trade, business, profession or occupation of an employer. . . .

''Section 45. Employee, Workman and Operative. The terms 'employee,' 'workman,' and 'operative,' as used in this act, shall be construed to mean:

''(1) Every person in the service of the state, and of every county, city, town, municipal corporation, or school district, including regular members of lawfully

constituted police and fire departments of cities and towns, under any appointment or contract of hire, express or implied, oral or written, except any elective official of the state, or of any county, city, town, municipal corporation, or school district therein, or other official receiving more than $2,400.00 per year salary.

"(2) Every person, except agricultural laborers as designated and domestic servants in the service of any employer, as defined in subdivision 2 of Section 44, who employs three or more workmen or operatives regularly in the same business, or in or about the same establishment, under any contract of hire, express or implied, oral or written, including aliens, and also including minors who are legally or illegally permitted to work for hire under the laws of the state, but not including any person whose employment is but casual and is not in the usual course of trade, business or occupation of his employer."

These two sections of the act of 1925 in the 1928 revision were changed to read as follows:

"§ 1418. *Employers included; independent contractor.* The following employers shall be subject to the provisions of this article: The state, and each county, city, town, municipal corporation and school district therein; and every person who has in his service three or more workmen or operatives regularly employed in the same business, or establishment, under a contract of hire, except agricultural workers not employed in the use of machinery, and domestic servants; employers of such agricultural workers and domestic servants may, however, at their election come under the terms hereof by complying with its provisions and the rules and regulations of the commission.

"The term 'regularly employed,' as herein used, includes all employments, whether continuous throughout the year or for only a portion of the year, in the usual trade, business, profession or occupation of an employer. . . .

"§ 1419. *Employee, workman and operative.* The terms 'employee,' 'workman,' and 'operative,' as used herein, mean: Every person in the service of the state, and of a county, city, town, municipal corporation,

or school district, including the regular members of lawfully constituted police and fire departments of cities and towns, under appointment or contract of hire, except the elective officials and except officials receiving more than twenty-four hundred dollars per year salary; every person in the service of any employer subject to this article as defined in the preceding section including aliens and minors legally or illegally permitted to work for hire, but not including a person whose employment is casual and is not in the usual course of trade, business or occupation of the employer.''

It will be readily conceded that the correct interpretation of the original section 44 excludes from the act employers of agricultural workers not using machinery and domestic servants, unless such employers elect to come under the law. It is equally certain that the same meaning is carried forward in the revision of that section as found in section 1418, *supra*. A comparison of the two sections shows some verbal changes were made, but no change in meaning. In the revision, employers of agricultural workers as designated and domestic servants are not subject to the act. Whatever may be said of changes in other sections, section 44, as revised, excludes from the act employees not working with machinery.

The next section (45) of the original act is complementary to section 44. The two sections fit into each other. The first names the employers subject to the act and the other the employees. The first excludes employers of agricultural workers not using machinery and domestic servants, and the latter likewise excludes them from the benefits of the act. The revision of section 45 into section 1419, although changing the verbiage, does not change the meaning, but in the respects now questioned takes particular pains to preserve the meaning of section 45 as originally passed. It is true, in naming who is an ''employee,'' ''work-

man,'' or ''operative,'' the revision substitutes for the phrase, ''Every person, except agricultural laborers as designated and domestic servants in the service of any employer, as defined in subdivision 2 of Section 44,'' the phrase, ''every person in the service of any employer subject to this article as defined in the preceding section.'' Sec. 1419.

Looking to section 44 and to the revision of it, section 1418, we find employers of agricultural workers not using machinery and domestic servants are not subject to the act, and such definition of ''employer'' is expressly preserved in section 1419. An employer, as defined in the preceding section, if his employees are agricultural workers not using machinery or domestic servants, is not subject to the act.

Just looking to the context of these correlative sections as originally passed and as revised, it is quite plain that employers of agricultural workers not using machinery do not fall within the act and are not subject to it unless they so voluntarily elect. If the portion of section 45 quoted above had been entirely omitted from the revised section 1419, the employers of agricultural workers not employed in the use of machinery would not under section 1418 be subject to the provisions of the act. In other words, the definition of employers, as found in section 1418, excludes from the provisions of the act employers of agricultural workers not using machinery; and if section 45 had never been enacted or revised as in section 1419, still employers of such workers would not be within the letter or spirit of the act.

We should not overlook that we have adopted a rule of construing the provisions of the Revised Code of 1928, where changes in the language have been made, to the effect that we will regard such changes as an effort to harmonize or reduce in language or remove inconsistencies, rather than an effort to change the

meaning of the law. The act authorizing the revision of the Code, chapter 35, Laws of 1925, directed the Code Commissioner to

"revise and codify the laws . . . harmonize where necessary, reduce in language, and remove inconsistencies where the same are found to exist."

The commissioner, after completing the work, in the preface to the 1928 Code says in part:

"It is hoped that the purpose and intent thus expressed have been fairly carried out. . . . To reduce statute law in language is not only the demand of the layman but produces clearness and certainty. . . . The 1913 Civil and Penal Codes contained 7057 sections. From 1913 to 1927 an additional 4499 sections of general legislation had been enacted. All this was reduced to 5349 sections."

The Compensation Act itself was reduced from 98 sections to 66. From the percentage in the reduction of language one might well conclude that was one of the chief things accomplished in fact or intended by the revision.

In *Re Estate of Sullivan,* 38 Ariz. 387, 300 Pac. 193, 195, we said:

"It is well known that it was the object of the code commissioner and the Legislature in preparing the Revised Code of 1928 to change the legal meaning of the existing law as little as possible, but, as stated in the preface to the official edition of said Code, 'to reduce in language' and to avoid redundancy. Chapter 35, Session Laws 1925. We should therefore presume that when a word, a phrase, or a paragraph from the 1913 Code is omitted from the Code of 1928, the intent is rather to simplify the language without changing the meaning, than to make a material alteration in the substance of the law itself. Of course, if the only conclusion which can be drawn from the new language is that it was intended to change the legal effect of the statute, the latest expression of the will of the Legislature must prevail, but where two meanings can be

given, we should assume rather that one which leaves the law as it was originally than the one which changes the legal effect of the statute as well as its phraseology.''

In *State Tax Com.* v. *United Verde Extension Min. Co.,* 39 Ariz. 136, 4 Pac. (2d) 395, 398, the question was as to whether a taxpayer who paid his taxes under protest was, in a successful suit to recover excess taxes, entitled to interest. We said under section 4887 of the 1913 Code he clearly was entitled to interest from the time of such payment, because it was so written in the law. We also said that he was entitled to interest, although the substituted section (3065) of the 1928 Code for section 4887, *supra,* had omitted the provision for interest. We cited to sustain such construction in *Re Sullivan's Estate,* 38 Ariz. 387, 300 Pac. 193, saying:

''We have previously held that, when a certain paragraph of the 1913 Code or the session laws following it is carried forward in changed language into the 1928 Code, the presumption is that the change is in form only, unless it clearly appears the legislative intent was to change the substance.''

Again in *Albert Steinfeld & Co.* v. *Allison Min. Co.,* 41 Ariz. 340, 18 Pac. (2d) 267, 270, we said:

''The purpose of such revision [1928] . . . was not to change the substance of the law but to simplify the language.''

There are other cases to the same effect.

It is manifest, we think, that neither the Code Commissioner nor the legislature intended to change the meaning of sections 44 and 45, *supra,* by the revision of 1928, but simply to reduce the language by substituting, for instance, in the revision of subdivision (2) of section 44 the two words ''every person'' for the ten words ''every person, firm and private corporation, including every public utility''; and in subdivi-

sion (2) of section 45, "every person in the service of any employer subject to this article as defined in the preceding section" for

"every person, except agricultural laborers as designated and domestic servants in the service of any employer, as defined in subdivision 2 of Section 44."

The change that the petitioner insists was made is very important and a far-reaching one. It would greatly modify the original Compensation Law, and that, too, when there is no evident purpose on the part of the legislature to make such change. Such a radical change of course was not intended.

■ We have construed section 1418, *supra*, in *Hight* v. *Industrial Com.*, 44 Ariz. 129, 34 Pac. (2d) 404, 405. The facts in the case were that Dr. R. J. Hight was farming about 1,000 acres of land in alfalfa, grain, and other farm products, and owned about 400 head of cattle, 250 head of which were being looked after for Doctor Hight by LeRoy Patten. Among Patten's tasks was that of pumping water for these cattle in his charge with a gasoline engine, but he did not cultivate any land or raise any crops. He was hurt while lassoing cattle. We held that Patten was not entitled to compensation because he was an agricultural worker not using machinery when injured. After quoting section 1418, we said:

"It is clear from this section that it was the purpose of the Legislature in enacting the Workmen's Compensation Law (Rev. Code 1928, § 1391 et seq.) to exclude from its terms those engaged in agricultural pursuits, except those employed in the use of machinery, and the probable reason for this was that in the opinion of the Legislature workers therein, other than those falling within the exception, are not sufficiently subjected to injury by accident to justify this extra burden on the employer. Hence, to compel them to procure insurance covering injuries that occur so infrequently, notwithstanding the lower rate of premium

required for this protection, places upon that industry, the Legislature must have felt, a burden incommensurate with the benefit received. . . .

"But if one is employed as a general agricultural worker, that is, to do the tasks one hired as an agricultural or farm hand is called upon to perform, and in the discharge of these duties it becomes necessary for him at times to use machinery and at others not to use it, he is entitled in the former but not in the latter instance to the protection the Compensation Law gives. This, of course, is true only when there are three or more employed in the use of machinery in the same business. Hence, if one, or even two, should be engaged in work of this character, and a third should be irrigating or doing work not necessitating the use of machinery, any injury resulting to either or both of the two former from an accident occurring while they were so employed would not, it seems clear, be compensable under the statutes, since there would not then be as many as three engaged in the phase of the work the Compensation Law covers."

This is a clear and definite declaration by this court that employers of agricultural workers not employed in the use of machinery are not subject to the law, unless they elect to be. It might be suggested that in the Hight case the claimed change in the law made by the revision was not called to the court's attention, and that if it had been the decision might have been different. We think there was no change in the law, and that if the point had been urged our decision would have been the same. So we conclude that the revision of the Workmen's Compensation Law of 1928 did not change the meaning of sections 44 and 45, but that a correct construction of the revised sections will give them the meaning of the corresponding sections in the original act.

█ █ The other point made by petitioner, if we understand him aright, is that because Johns and Brand were buyers and shippers of lettuce Melendez and his co-employees engaged in harvesting the let-

tuce were not agricultural workers, but industrial workers. We get this thought from the petitioner's fourth proposition of law, which is:

"Harvesting of crops when it is not a part of the ordinary mixed duties of a farm hand, but is a matter of skilled occupation pursued by a person not engaged as a farm hand, is industrial and not agricultural labor."

Whether this states a correct proposition of law we do not undertake to determine. It has no application here. Under the evidence all the employees were engaged in the same business; that of harvesting a lettuce crop. The mere statement of what they were doing shows it was not skilled work, but common labor; also, that there were no mixed duties. The Industrial Commission's findings are that such work was agricultural and that the employers had not elected to be subject to the Compensation Law. If the commission had found the employers were within the provisions of the act, it would have been contrary to both the facts and the law. In *Hight* v. *Industrial Com., supra,* one of the questions was whether a cow hand whose task was to look after cattle was engaged in agricultural work, and we held that he was. We quoted from three standard works the definition of "agriculture," and all of them agreed that it includes: one says "harvesting of crops," another "removing the crops," and the other "gathering in the crops." In other words, the harvesting of a crop is just as essentially agricultural as is the planting and cultivating of it to maturity.

Nor do we think the incident of ownership changes the character of the work of harvesting from agricultural to industrial or commercial work. Where lettuce is grown as a commercial article, as in Arizona, it must be cut, picked, and crated for the market, and whether by the grower or the purchaser the work is agricul-

tural. It does not cease to be agricultural on change of ownership, as where the grower before it is harvested sells the crop to a third person who harvests and markets it.

When an agricultural worker ceases to be such under the Compensation Law excluding him from its provisions and becomes otherwise, because he is doing for his employer work not agricultural in character, has been before the courts and has received different answers (*Miller & Lux* v. *Industrial Com.,* 179 Cal. 764, 178 Pac. 960, see 7 A. L. R. 1296, *Industrial Com.* v. *Shadowen,* 68 Colo. 69, 187 Pac. 926, 13 A. L. R. 955, *Cook* v. *Massey,* 38 Idaho 264, 220 Pac. 1088, 35 A. L. R. 208, *Smith* v. *Jones,* 102 Conn. 471, 129 Atl. 50, 43 A. L. R. 954, and 107 A. L. R. 977), but that question is not here. Melendez was doing nothing but agricultural work.

In *Ocean Accident & Guarantee Co.* v. *Industrial Com.,* 69 Utah 473, 256 Pac. 405, 407, the evidence shows that the employer owned 180 acres of land, from a part of which it was engaged in excavating, cleaning, and marketing gravel and sand, and upon about 40 or 50 acres of which tract it was growing alfalfa hay, which was fed to the animals used in operating the gravel pit. The employee's work was exclusively in the growing and harvesting of the alfalfa, and while he was at such work he was struck and killed by lightning. The controlling statutes in the case were sections 3110 and 3111, Compiled Laws Utah 1917, as amended by chapter 63, Laws Utah 1919, a part of the Workmen's Compensation Law. An inspection of these two sections shows that our sections 44 and 45, *supra,* must have been copies thereof with the difference that our sections include employers of agricultural workers employed in the use of machinery, a provision that occurs in no other Compensation Act, so far as we have been able to ascertain. In passing

upon whether the widow and children of the deceased were entitled to compensation, the court said:

"Cutting and raking hay are essentially agricultural pursuits and persons employed to perform such work and paid by the day are agricultural laborers. Tested by the nature of the work the deceased was performing at the time he met his death, he was expressly excluded from the provisions of the Workmen's Compensation Act above quoted. . . .

"The cultivating, irrigating, cutting, raking, hauling, and stacking of hay requires almost constant attention and constitutes an occupation or business as much as that of marketing sand and gravel. The mere fact that the company's agricultural pursuit was a minor business or occupation does not change its status so long as the agricultural operations are of such a nature as to constitute a usual trade, business, or occupation.

"It is contended on behalf of the applicants for compensation that the general business of the employer is the controlling feature in determining the nature of the employment and the right to compensation. It will be observed that the provisions of the Workmen's Compensation Act place domestic servants and agricultural laborers in the same class. It seems clear that the Legislature intended that an employer of agricultural laborers, as well as an employer of domestic servants, does not come under the provisions of the act without he elects so to do so long as the employees are engaged exclusively in the one or the other of those vocations. It would be a strange doctrine to hold that domestic servants of a person whose occupation is subject to the provisions of the Workmen's Compensation Act are within its provisions while domestic servants of a person engaged in an agricultural pursuit are excluded therefrom. On principle we can see no good reason why an employer engaged in any of the occupations included within the act may not have employees engaged exclusively in agricultural work and be subject to the same law as the agriculturalist is subject to when he employs agricultural laborers, and we believe such was the clear intention of the Legislature as expressed in the Workmen's Com-

pensation Act. Indeed, to hold otherwise may well subject the act to the constitutional objection of class legislation. A person whose general business is that of a manufacturer, merchant, banker, or other trade or occupation covered by the Workmen's Compensation Act, has the same right to also engage in agricultural pursuits, and while so engaged in an agricultural occupation should be, and we are of opinion is, subject to the same law as a person who makes agriculture his exclusive occupation or business. This principle is well established by numerous adjudicated cases, among which the reader is referred to the following: *Shafer* v. *Parke, Davis & Co.,* 192 Mich. 577, 159 N. W. 304; *Marietta* v. *Quayle,* 79 Ind. App. 9, 137 N. E. 61; *Dowery* v. *State,* 84 Ind. App. 37, 149 N. E. 922; *Seggebruch* v. *Ind. Comm.,* 288 Ill. 163, 123 N. E. 276; *Vaughan's Seed Store* v. *Simonini,* 275 Ill. 477, 114 N. E. 163, Ann. Cas. 1918B, 713; *In re Patrick Keaney Case,* 217 Mass. 5, 104 N. E. 438.''

The general rule is stated in 28 Ruling Case Law 718, section 11, as follows:

''Agricultural employment has been excepted, as a rule, from the operation of the compensation acts in the United States, Canada, and England, though it frequently has been provided that farmers may elect to bring themselves within the statute. Here, as elsewhere, the test is the work actually performed by the employee, and not the general occupation or purpose of the employer. The expression 'agriculture' includes horticulture, forestry, and the use of land for any purpose of husbandry, inclusive of the keeping or breeding of live stock, poultry, or bees, and the growth of fruit and vegetables. The numerous tasks incidental to these activities are all within the scope of the employment of a farm laborer.''

71 Corpus Juris, 376, section 92, states the rule as follows:

''By the weight of authority, whether an employee is a farm laborer, under a compensation act, is determined by the general character of the work he is required or was hired to perform, and not by the ordi-

nary or principal business of the employer, if that business is one other than that in which the employee is engaged, nor by the particular task on which the employee was engaged when injured, nor by the place where it was being performed." See, also, *Hight* v. *Industrial Com., supra.*

What was said by the court in *Dowery* v. *State*, 84 Ind. App. 37, 149 N. E. 922, 923, is particularly applicable to our statute:

"It is to be observed that the statute does not classify the employe in accordance with the general occupation or business of the employer. Whether a laborer is or is not a farm employe is determined from the character of the work he is required to perform."

To the same effect, see, also, *Peterson* v. *Farmers' State Bank*, 180 Minn. 40, 230 N. W. 124; *Koger* v. *A. T. Woods, Inc.*, 38 N. M. 241, 31 Pac. (2d) 255.

We conclude that the business of harvesting a lettuce crop is agricultural; that petitioner's work at the time he was injured was agricultural; that the business of cutting, picking, and crating lettuce, and those employed in such work, are excluded from the terms of the provisions of the Compensation Act, unless the employer elects to come under such act; and that, since the employers here did not so elect, the Industrial Commission was without jurisdiction to make an award to petitioner, and properly dismissed his application.

McALISTER, C. J., concurs.

LOCKWOOD, J. (Dissenting).—In determining the meaning of a statute, two of the most important canons of construction that we must consider are the evils which the law was intended to remedy, and its historical background and setting. *Bank of Lowell* v. *Cox*, 35 Ariz. 403, 279 Pac. 257; *Grosjean* v. *American Press Co.*, 297 U. S. 233, 56 Sup. Ct. 444, 80 L. Ed. 660; *Giragi*

v. *Moore,* 49 Ariz. 74, 64 Pac. (2d) 819, 110 A. L. R. 320.
This is particularly true when new legislation involves
a radical and far-reaching change in the economic,
financial, and legal public policy of the state. We have
already grown so used to the Workmen's Compensa-
tion Law as a part of our economic and legislative
structure that we are prone to forget how recently
it has come into being, how radically it has changed
our entire conception of economics, the particular evils
it was intended to remedy, and the method chosen to
reach that result, together with the reasons for and
the limitations of such method. For centuries, in prac-
tically every country of the world, the employee in
all fields of production was required to bear the whole
cost of an injury resulting from an accident arising out
of and in the course of his employment, unless such
accident was due solely to the fault or negligence of
his employer. Statistics show us that approximately
70 per cent. of industrial accidents are not due to the
latter cause, while many times, due to poverty, igno-
rance, and the power of the employer, the workman was
unable to obtain adequate compensation even in the
remaining 30 per cent. of cases where the injury was
legally chargeable to his employer. Gradually, how-
ever, the idea that it was morally unjust to the indi-
vidual and, in the long run, economically unsound
socially to place the burden of such losses on the
shoulders least able to bear them, began to evolve. In
1884 the first Compensation Law in history was en-
acted in Germany; Austria followed this policy in 1887;
and practically all the countries of Europe, together
with Canada and Australia, had adopted the same prin-
ciple before the close of the nineteenth century. It
was not until 1908 that the first Compensation Law
was adopted in the United States. The movement,
however, once started, gained increasing impetus until
at the present time almost every state in the nation has

some form of workmen's compensation. While the various acts differ greatly in detail, yet the same central principle is the basis of every law of that nature. That principle is well stated in the case of *Kenny* v. *Union R. Co.,* 166 App. Div. 497, 152 N. Y. Supp. 117, 121, in the following language:

"The plain purpose of the statute was to make the risk of accident one of the industry itself, to follow from the fact of the injury, and hence that compensation on account thereof should be treated as an element in the cost of production, added to the cost of the article and borne by the community in general."

And the method followed is that universally used when it is sought to distribute the risk of unexpected incidents, such as death, fire, and other unpredictable happenings.

"The scheme of the statute is, in brief, to charge upon the business, through insurance, the losses caused by it, making the business and the ultimate consumer of its product, and not the injured employee, bear the burden of the accidents incident to the business." *Spratt* v. *Sweeney & Gray Co.,* 168 App. Div. 403, 153 N. Y. Supp. 505, 506.

Since unquestionably the fundamental reason for compensation laws is to take the burden of loss by injury incurred in and as a result of employment from the individual and place it upon the community as a whole, if the general principle be accepted, every consideration of sound logic and abstract justice would require that *every* employee should be so protected. Practically, however, legislation is often affected by reasons other than the justice and logic of the proposed law. Under our system of government, the attitude of the legislative bodies towards any proposed law is always based upon what they believe represents the true wishes of their effective constituency. By "effective constituency" I mean the men who actually de-

termine the election of the legislators, as distinguished from that great body of citizens who, from one reason or another, exercise no effective influence on the selection of their officers. The method of insurance universally adopted in the compensation laws is the primary payment by the employer of the cost of such insurance, whether through premiums to the state acting as the insurance carrier, or to private corporations or individuals acting in the same capacity, or, in some cases, where the employer is very strong financially, through direct payment of compensation by it. But in all these cases the theory of the law is that the cost of insurance so advanced by the employer shall eventually be passed on to the ultimate consumer in the form of an increased cost of the product, just as wages, taxes, overhead, and cost of material are passed on through the price of the product sold. In actual practice there are certain classes of employers who are unable, for one reason or another, to pass on the costs, as would generally be the case with the employers of domestic servants, and with those who, through lack of organization, knowledge of accounting and business experience, do not know how to do so; the largest class of this latter type being the small farmers. These employers not only are very numerous, but possess a political strength even greater than their numbers alone would indicate. It was obvious when the compensation laws were first proposed that the great majority of these two classes would be bitterly opposed to such a law if they were required to advance the cost of compensation insurance for their employees, with no apparent possibility of passing it on. There is no doubt that the exclusion from responsibility under the compensation acts of nearly every state of employers of agricultural and domestic servants was not caused by the belief that the employees of those classes should, as a matter of natural justice, be re-

quired to bear the burden of accidents occurring in their employments, when employees of a different character were protected, but was dictated by pragmatic reasons based on the considerations above set forth. Those who remember the election at which our Compensation Law and the constitutional amendment authorizing it were approved by the voters, have not forgotten the careful explanation made to the small farmers and the employers of domestic help that they could safely vote for the law because they would not be subject thereto. The employers who were within the terms of the act were extremely few in number when compared to the total number of voters in the state, although their employees comprised probably a considerable majority of those who worked for wages. The effect and doubtless the purpose of the law was, therefore, to distribute the benefits of the act as widely as was then considered practically possible among employees, without alienating a sufficient number of the employers to defeat the act entirely at the polls. Nor when we consider the frailty of human nature and the tendency of almost all men to regard their immediate financial interests ahead of those of their less favored neighbors, or even their own ultimate good, can we say that such a limitation of the benefits of the original law was, considering the circumstances as they existed at that time, unwise? The old adage that "half a loaf is better than no bread" was never applied with greater advantage to the employed classes. But the fact that a certain limitation was practically necessary, though theoretically unsound, when the act was first passed, does not prevent the legislature from bringing the law into closer harmony with economic justice from time to time as circumstances permit, and I think that when an amendment to the law is made, the courts should construe that amendment in harmony with sound general principles of economic

progress and for the protection of the weaker members of society, rather than to assume the legislators are adhering to a limitation which was originally based on necessity rather than justice.

· With this brief review of the background of our law, the evils which it was designed to remedy, and the method·used, let us consider the language of the act. On examining chapter 83 of the Session Laws of 1925, which was our original Compensation Law, it is· obvious that it was the intent of the legislature at that time to limit its application somewhat, instead of granting protection to all workmen who, by strict logic and economic justice, were entitled thereto. This was done in two manners: (a) By defining the employer who should be subject to the liability of the act; and (b) by defining the employees who were entitled to its benefits. In other words, in order for an injured employee to obtain compensation, his employer must have been one of a class who came under the act, and he himself must have been one of the employees of such employer who was protected thereby. Section 44 of the act defines the employers who are subject thereto as being, with additions which we need not consider in this case, "every person . . . [who] has in service three or more workmen . . . regularly employed in the same business, . . . except agricultural workers not employed in the use of machinery, and domestic servants." By the plain language of this section the only reason for any mention whatever of any class of employees therein was to aid in the identification of the employer, and the reference to "agricultural workers not employed in the use of machinery, and domestic servants" can only be for the purpose of stating that these employees were not to be counted in determining whether their employer had three or more workmen of the class necessary to bring him under the act. The employer himself might be

engaged in any class of business, from the manufacture of copper to the growing of lettuce, from retail dry goods to the operating of a cattle ranch, but the test as to whether he came within the act was not the nature of his business, but the number of his employees who were not agricultural workers or domestic servants. Many persons and corporations who are engaged in extensive farming operations which require the use of machinery are undoubtedly subject to the act and carry compensation insurance regularly, notwithstanding that they have also many employees who are agricultural laborers not using machinery. The test for them is, "Have I three employees using machinery? If I have, the number who are not using machinery is immaterial. I, as an employer, come within the law."

It is in the discussion of the definition of "employer" in section 44, *supra,* that, in my opinion, the majority of the court has, inadvertently I am sure, first departed from firm ground by a wrong conclusion as to the class of employers excluded from responsibility under the act. No less than nine times do they say, in exact language or in substance, "section 44 excludes from the act employers of agricultural workers not using machinery." This is not true either in substance or in form. The section does not exclude any employer from the act directly. It merely states who shall be included. It will immediately be said that those not included are, by implication, excluded. True, but the inclusion is based on the affirmative employment of certain classes of labor, and the exclusion is not based on the affirmative employment of other classes, but on the failure to employ the required class. Yet the majority say, in substance, "the exclusion of certain employers is based on the fact that they affirmatively employ certain classes of labor." Concretely, "certain employers are excluded because

they employ agricultural workers not using machinery, and domestic servants.'' I am sure they do not mean this. What the section does say, in substance, is,

''Every person that has in service three or more workmen regularly employed in the business is an employer within the meaning of the section, but in counting these workmen we do not count his agricultural workmen of the class mentioned.''

The reference to agricultural laborers in section 44 is not for the purpose of defining who is an employee entitled to the benefit of the act, but solely to determine who shall or shall not be counted to ascertain if the employer is subject to its liabilities. Again they say,

''if section 45 had never been enacted or revised as in section 1419, still employers of such workers (agricultural laborers not using machinery) would not be within the letter or spirit of the act.''

They certainly do not mean this. The correct statement would be,

''if section 45 had never been enacted or revised as in section 1419, still such workers would not be counted in determining whether or not their employers possessed three workmen of the character required to bring the employer (not the employee) within the act.''

I quite agree, nay I insist with all my power, and my whole argument is based on the fact that section 45 and its substitute section 1419 have nothing to do in any way, shape, or fashion in determining what employers come within the act. That question is determined by section 44 and its substitute section 1418 alone. And when once the status of an employer is fixed by these last sections, it is in no manner changed by anything appearing in sections 45 and 1419.

But even though the employer be subject to the act, one working for him who seeks compensation must be

an employee within the definition laid down in sections 45 and 1419, which alone define employees.

It is agreed that section 1418 defines an employer substantially in the same manner as section 44. It is when we compare the definition of an employee in section 1419 with that in section 45 that I differ from the majority of the court. They say the two definitions are the same. I claim they differ widely. Let us test this by changing the arrangement of section 45, stating the general rule first, and the exception separately and later. It will then read,

"Employees shall be construed to mean . . . every person . . . in the service of an employer as defined in subdivision 2 of section 44, who employs three or more workmen . . . regularly in the same business, etc. The word 'person' shall not include agricultural laborers as designated in section 44, and domestic servants, or any person whose employment is but casual."

We agree that is what the section means, and of course under it no agricultural laborers not employed in the use of machinery could claim compensation, not because their employers were not of the class declared subject to the liability of the act by section 44, but because they were expressly excepted from the class of employee entitled to its benefits as defined by section 45.

Let us now change the arrangement of section 1419 in the same manner as we did section 45. It will then read,

"The term employee, as used herein, shall mean . . . every person in the service of any employer subject to this article as defined in the preceding section. The word 'person' shall not include a person whose employment is casual."

What is it that is "defined in the preceding section?" The employer and the employer only. Then every per-

son working for such an employer is an employee, with the sole exception of casual workers.

If section 45 had never appeared in the law, I doubt if it would have even been suggested by anyone that under sections 1418 and 1419, if the employer was within the law, any of those working for him in that business would have been barred from compensation, except casual workers not in the usual course of business of the employer.

It seems to me the only manner in which the majority could have reached the conclusion they did is by a misunderstanding or misapplication of the rule laid down in *Re Estate of Sullivan, supra*. Notwithstanding the only reasonable "conclusion which can be drawn from the new language is that it was intended to change the legal effect of the statute," they have refused to apply the rule that "the latest expression of the will of the legislature must prevail," but have resorted to the "presumption that the intent is rather to simplify the language without changing the meaning," overlooking entirely the rule that a "presumption" is always destroyed by definite evidence to the contrary. If, therefore, the employers in the present case had three or more employees, such as truck drivers, packers in the lettuce shed who never stepped foot on the ground where the lettuce was grown, makers of the crates in which the lettuce was packed, and the like, who were not "agricultural laborers not employed in the use of machinery," it made no difference whether the business in which the employers were engaged, and in which petitioner was injured, should be classified as farming, wholesaling, shipping, or anything else, they were subject to the liability of the act, so far as that business was concerned. And if the employer is within the act, then all his employees engaged in that business, except casual workmen, are protected by the act, no matter what was the character

of the work they were doing at the time. That such an interpretation is in strict accord with economic justice and with common sense seems to me to be clear.

Under the opinion of the majority of the court, an employer may be running a large farm, with half a dozen men operating machinery and an equal number using only hoes, shovels, and similar tools which do not come within the definition of machinery. The man with the tractor in a row of cotton is being followed by the ''man with a hoe.'' In some manner the tractor is upset and both its driver and the other man are injured thereby. The one receives compensation and the other does not. Is this justice? In the very accident which occurred in the present case, had the truck driver been injured at the same time that petitioner was, he would unquestionably have been entitled to compensation, and yet petitioner, injured in the same accident, working for the same employer in the same business, would not. That the legislature had the power to make this distinction, and that it did make it in the original act, I do not deny, but I think when it changes the act so that the precise language of the new law is naturally and logically in harmony with the liberal interpretation, rather than the original restricted one, every principle of justice, and the canons governing the interpretation of statutes, require that the liberal, rather than the restricted, construction, should be applied.

The majority opinion refers to a number of cases as upholding the principle laid down by it. In the case of *Hight* v. *Industrial Com., supra,* we held merely that the injured employee, being an agricultural worker, was not to be counted in determining whether his employer fell within the law, and this is undoubtedly correct. I do not think, however, that there was any holding or intent of considering or holding in that case that the employer was within the act, but

that, notwithstanding this, the particular injured employee was not entitled to compensation. The case turned on the question of whether the employer was subject to the act, and not whether the employee was entitled to its protection. The case of *Ocean Accident & Guarantee Co.* v. *Industrial Com., supra,* cited by the majority opinion, shows clearly that under sections 44 and 45, as we have stated, not only the agricultural laborer was not counted in determining whether the employer fell within the category, but neither was he in the category of the employee who could recover. I have no quarrel with the rule laid down by the Supreme Court of Utah in that opinion, but our statute of 1928 is materially different from the one in force in Utah.

I am of the opinion that if the employer comes within the definition set forth in section 1418, *supra,* then any of his employees engaged in that particular business, with the exception of casual workers, are entitled to the benefits of the Compensation Law, and that the award should be set aside and the matter referred to the Industrial Commission for appropriate action.